UNITED STATES DISTRICT COURT
EASTERN DISITRICT OF NEW YORK

------------------------------------------------------X

John Carlo Manigaulte,

-against-

C. W. Post of Long Island University

------------------------------------------------------X

**★FILED★**

**2008 JUN 30   AM 10: 44**

CLERK
U.S. DISTRICT COURT
E.D.N.Y.

AMENDED COMPLAINT
CV 08-1853 (JS)

TO THE MOST HONORABLE DISTRICT JUDGE SEYBERT:

### THE PLAINTIFF'S APPRECIATION

The Plaintiff ("John C. Manigaulte") wishes to thank the Court for extending the courtesy to the

Plaintiff to amend his complaint. The Plaintiff also wishes to express his gratitude to the Court

for granting his application to proceed in forma pauperis.

The Plaintiff appreciates the gravity of filing complaints in Federal District Court and assures the

Court that he will do his best not to waste the Court's valuable time or its limited resources. To

this end, the Plaintiff assures the Court that this amended complaint was produced in good faith

and he asserts that he has evidence that suggests that C. W. Post of Long Island University (the

"College") responded with retaliatory animus to the Plaintiff's concerns that its special version

of "process pedagogy" might not adequately consider learning disabilities by terminating his

employment and by "revising" a Faculty Handbook so that there would be a "legitimate reason"

for their actions. In more stark terms: the Plaintiff wishes to assure the Court that his complaint is

neither "frivolous" nor "malicious."

Because the Court respectfully suggested in its "Memorandum and Order" dated May 28, 2008 that "all complaints, including pro se complaints, are required to contain at least 'some minimum level of factual support for their claims," the Plaintiff has seen fit to attach evidence in the form of several EXHIBITS, which should bolster the arguments herein presented. Lastly, the Plaintiff has pleaded with a former managing editor for a national magazine (Paul Siudzinski) to voluntarily review and edit this complaint and offer non-legal advice regarding its clarity and succinctness of expression at no cost to the Plaintiff. Moreover, out of the generosity of their respective hearts, both Mr. Siudzinski (a close friend) and the Plaintiff's sister, Lillian E. Manigaulte, a Master Tax Advisor and Enrolled Agent, have provided temporary, timely, and extremely helpful assistance by reviewing this complaint and offering much-needed revisions.

However, since neither Lillian Manigaulte nor Paul Siudzinski are attorneys, it is very encouraging that the Court emphasized the basic responsibility of all courts to read Plaintiffs' pro se complaints "very liberally" and "to raise the strongest arguments that they suggest." If this complaint is a bit too long, it is so because the Plaintiff truly wishes to save the Court valuable time and effort by carefully *detailing* the specific facts of his complaint so that the College might be better able "to frame an intelligent defense," should the true facts allow such to occur.

<u>"TITLE VII" CONCERNS</u>

Because the Plaintiff has no evidence that his employment was terminated due to racial prejudice and because the Plaintiff has no desire whatsoever to waste a truly compassionate and wise Court's valuable time in addressing an issue that may in actuality have no bearing on his termination, the Plaintiff does <u>not</u> charge the College with Title VII violations in this amended

complaint, unless the Court, itself, sees potential basis for a reasonable person making such a claim.

Suffice it to say that the Plaintiff's general impression of his employer is that there does not appear to be a representative sample of minority professors teaching at the College and this "appearance of fact" may or may not be related to Title VII violations.  In fact, the Plaintiff requested (in an e-mail to Edmund Miller, the Chair of the English Department)  "information regarding the number of minority adjuncts working in the [English Department]" at C. W. Post and was informed by Dr. Edmund Miller (in a responsive e-mail) that "a quick survey of teachers in the English Department suggests that there is one minority among the eighteen full-time faculty (black) and that there are three minorities among the forty-seven adjuncts (one Hispanic and two black). All four of these people are teaching in spring 2007."

To the best of his knowledge, the Plaintiff does not presently know whether *other* adjuncts were submitted to the close scrutiny as Ms. Kremer applied to the Plaintiff when she, in effect, began her queries regarding the Plaintiff's syllabus and his teaching methods early in the year 2006.

It should be noted that the Plaintiff filed year after year similar syllabi with his department and there never appeared to be a problem regarding either his syllabi or his method of instruction. Perhaps a case could be made for "disparate treatment" regarding the demands Ms. Kremer made for changes in both the Plaintiff's syllabus and his teaching methods in media res (during the middle of the semester)? From leisurely chats with other adjuncts, the Plaintiff believes that it is highly unlikely that Ms. Kremer subjected *other* adjuncts to such close scrutiny or to the very

same standards and demands she made of the Plaintiff—but an in depth analysis of this suspicion would likely entail additional research and the Plaintiff's time and energies are presently being exhausted on reviewing the evidence, composing this amended complaint, and formulating additional possible "motions"—all the while dealing with psychotherapy, new medication, and the other basic contingencies of life most people was deal with on a daily, weekly, or monthly basis.

With much due respect for the Court's time and limited resources, the Plaintiff must admit, however, in all honesty, that he initially enjoyed a cordial and professional-only relationship with his supervisors (including Ms. Kremer and Mr. McNabb), and because of this and *only* because of this, he suspects that it is unlikely that race was a motivating factor for the Plaintiff's termination from employment. Of course, there is always the issue of subconscious racism. Perhaps Ms. Kremer and Mr. Kremer acted unintentionally when they narrowed their sights on the Plaintiff. Does the legal establishment consider such possibilities? Probably not. Only academics deal with so many "hypotheticals." If gut reaction means anything at all, the Plaintiff is forced to conclude that it appears to be a waste of the Court's valuable time to be distracted with the possibility of racial discrimination when there appears to be plenty of evidence that the College clearly violated the Americans with Disabilities Act of 1990, 42 U.S.C. § 1211(e), et seg. ("ADA"). Put differently, there appears to be no solid evidence whatsoever that the College has violated Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seg. (1994).

As for violations of New York State (NYS) law, the Plaintiff humbly and most respectfully petitions the Court to consider the appropriate case law of NYS regarding possible violations of pertinent statues thereof since the Plaintiff is not an attorney and he has somewhat limited knowledge of the law (and limited time and energy to further investigate these issues).

## "SHORT AND PLAIN" STATEMENT OF CLAIM

Plaintiff states that he is afflicted with and treated for Attention Deficit Hyperactivity Disorder ("ADHD") and Post Traumatic Stress Disorder ("PTSD"), both of which comprise his "learning disability." Indeed, both he and other human beings are always learning something, regardless of whether they purposely intend to learn something. Indeed, employees work hard to learn how to please their employers or they risk being "terminated" as in the rather distressing example of the present complaint before the Court. Moreover, when instructors receive favorable senior faculty reviews, they arguably learn that their teaching is essentially above reproach, as far as their employers are concerned. They learn that they stand a good chance of keeping their jobs and advancing in their employment status (i.e., getting "promoted"). Scholarly research, itself, is a learning process; few academics would object to thinking of their work in this fashion.

The Plaintiff provides a medical description herein and suggests that his disability periodically varies in its effects; in other words, the Plaintiff's learning disability is a disorder of "inconsistency," somewhat similar to epilepsy in that very few (if any) persons with epilepsy suffer continuous seizures. The "inconsistency" of ADHD is addressed in an actual medical description of ADHD (herein provided as a "excerpt"). The Plaintiff also asserts that his disability substantially limits major life activities, particularly work (but not exclusively work),

despite the fact that he has achieved some success in his career (i.e., he has earned a terminal degree and has been hired to teach at several respected colleges).

Evidence to support the Plaintiff's assertion of an inconsistent "work history" (indicative of the typical "inconsistency" of ADHD) comes in the form of the Plaintiff's life-long (to date) work history as presented by Social Security Earnings. Other work-related difficulties (e.g., actually having to stop work (or actually having to stop studying in college) because of life-disrupting ADHD and PTSD symptoms) are also referenced in psychological evaluations and reports (to be attached to this complaint) and public school transcripts, all of which show "medical reasons" for necessary "accommodations" and/or "temporary withdrawals" from schoolwork to deal with medical issues such as anxiety. Hopefully, the Plaintiff's psychotherapists will get their reports to him in a timely fashion (before the end of the month) so that said reports can be dutifully attached to this complaint. If not, the Plaintiff promises to provide these documents (during "discovery" one would suppose) as they become available.

"FACTUAL" SUPPORT FOR COMPLAINT

Because the Court stated in its "Memorandum and Order" that "in amending his complaint, Plaintiff may include factual allegations *detailing actions* (Plaintiff's emphasis) taken by or involving individuals with supervisory control," the Plaintiff has included more pertinent *details* in this amended complaint and pleads with the Court not to consider these extra details to be "too verbose." A pro se litigant often wonders what is the proper thing to do.

SUNSTANTIALLY LIMITING EFFECTS OF PLAINTIFF'S DISABILITY

It should be noted that the Plaintiff's life-long work history is just a small part of the overall presentation of the substantially limiting effects of his disability. The following chart is offered

as evidence of inconsistent earnings throughout a life-long work history excerpted from the Plaintiff's annual Social Security Statement.

| Years Worked | Taxed Social Security Earnings | Years Worked | Taxed Social Security Earnings | Years Worked | Taxed Social Security Earnings | Years Worked | Taxed Social Security Earnings |
|---|---|---|---|---|---|---|---|
| 1972 | $20 | 1980 | $698 | 1988 | $7,811 | 1996 | $9,740 |
| 1973 | $0 | 1981 | $968 | 1989 | $6,573 | 1997 | $4,940 |
| 1974 | $112 | 1982 | $0 | 1990 | $14,034 | 1998 | $233 |
| 1975 | $119 | 1983 | $1,449 | 1991 | $19,310 | 1999 | $8,086 |
| 1976 | $1,061 | 1984 | $2,775 | 1992 | $6,211 | 2000 | $38,862 |
| 1977 | $518 | 1985 | $6,316 | 1993 | $416 | 2001 | $11,745 |
| 1978 | $1,889 | 1986 | $7,103 | 1994 | $4,650 | 2002 | $16,402 |
| 1979 | $1,640 | 1987 | $12,253 | 1995 | $9,450 | 2003 | $18,714 |

*It should be noted that the Plaintiff earned his Ph.D. in mass communication in 1999 (to set the record straight) and that his record of earnings reprinted above, while a bit dismal in terms of livable wages, suggests gradual improvement for several decades, the most improvement coming in the most recent years. The trend, in other words, is toward more and more success as the Plaintiff is able to make more and more adjustments in his life as he learns more and more about how to deal with his learning disability.

The Plaintiff petitions the Court to compare his life-long work record (herein presented until 2003) with data regarding average salaries for average Americans. This might be difficult because: is one supposed to balance for hard economic times? Is the average American likely to hold a job for more than 12 months? The purpose of this comparison, one would suppose, is to catch a better glimpse of the Plaintiff's disability. According to Indeed.com (a job website), average salaries for people with B.S. degrees are roughly $66,000; with Master's degrees

average salaries are roughly $69,000; and with Ph.D.'s average salaries are $87,000. Of course, these figures may be off, but one gets the basic idea—advanced college degrees usually lead to "bigger and better things."

But not in the case of the Plaintiff! Advanced college degrees have not lead to "bigger and better things." The Plaintiff presently finds himself on pubic assistance, needing both Medicaid and food stamps by which to survive. The Plaintiff's heart-attack like symptoms last year were probably driven by stress and post-termination anxiety, so one therapist seems to think. A "nuclear stress test" in a reputable cardiology clinic was negative, suggesting that stress was the true "culprit." From most perspectives, however, the situation the Plaintiff presently finds himself in could hardly be considered "bigger and better things." Moreover, it seems that the Plaintiff's situation could have been avoided had the College offered some measure of "accommodation," just what Congress was, apparently, looking for.

### DISABILITY (IN SPITE OF "TALENTS" AND/OR "SPECIAL SKILLS")

To make a subtle but important point regarding disability, it seems reasonable to consider Ray Charles, a gifted performer with enormous talent; yet, no one would rightly claim that he was not disabled. He was blind. And, as such he was entitled to protection under the ADA. That he was able to earn a fabulous salary is a tribute to his hard work and his God-given gifts, and also, let us not forget, to the help he most likely received from important persons in his life—probably his family, his supervisors, and assorted other persons of a compassionate ilk. Even so, Mr. Charles was indisputably disabled—physically so—which is, perhaps, easier to recognize (and understand) than non-physical disabilities.

Few would probably deny that Mr. Ray Charles has (or, rather, *had*) a disability simply because he was enormously successful with his music (n.b., Mr. Charles is presently deceased). Likewise, it seems that it would be an enormous philosophical "stretch" to say that the Plaintiff herein considered does <u>not</u> have a disability simply because his God-given gifts allowed him to earn a terminal degree and simply because he can write well and argue cogently (given the opportunity to proceed at his own pace when he is able to "hyperfocus," a term that will be explained shortly).

It seems reasonable to suggest that the debilitating nature of one's "mental" disorder should not lie exclusively with one's ability to *reason* (as one is able to) but with one's ability to *function* socially. It would also seem that the determination of "social functioning" should include a review of one's *total* record of "social functioning," not brief extracts of success, such as obtaining a college degree (or several college degrees). The ADA seems to argue that "the continuing existence of unfair and unnecessary discrimination and prejudice denies people with disabilities the opportunity *to compete on an equal basis*" (Section 12101 (9) (my emphasis). These words appear to be more related to "social functioning" than to "specific achievements," as "to compete on an equal basis" suggests an *ongoing* social functioning, not "extracts" from one's total life experience. In other words, The ADA seems to argue *for* evaluating one's disability in terms of one's ability to "compete on an equal basis." But with *whom?* The average *American* or the average *academic* (who holds a similar degree with the Plaintiff)?

In this particular case, it does not really matter, because the Plaintiff has a very spotted work history, when viewed over the course of his life. Very few *average* Americans in *average*

economic times would be unable to work for one particular company, corporation, college, or business enterprise for more than 12 months at a stretch. Most average Americans have probably been able to hold a full-time job for three or more years, possibly even more!

Moreover, when considering the "substantially limiting effects" of the Plaintiff's disability, it should be noted that (a) the Plaintiff has *never* been able to purchase a home or a condominium or any type of abode despite having earned multiple college degrees and despite being able to write extremely well and despite being able to reason to a high order of complexity; (b) the Plaintiff has also experienced in the recent past (2001) severe symptoms of PTSD and was not able to continue working full-time, as he had wished, (c) the Plaintiff has a personal psychological history that suggests that "dissociation" is an ongoing concern, when stress levels peak (i.e., this disorder is something like epilepsy in its "inconsistent effects"), and finally (d) severe stress, especially from work, should be minimized because it can lead to severe depression (and ultimately and possibly to suicide), given the Plaintiff's early childhood abuse and the ravages this wrecks on the human soul.

It seems grossly unreasonable to suggest that here, in America, in the "land of plenty," that the *average* American could not somehow come to earn enough to purchase a home or some type of abode. It seems also highly unlikely that the *average* American could not work a full-time job for a significant length of time. It also seems unlikely that the *average* American would have to work so hard just to keep his head above water.

## GIVEN FREEDOM TO WORK – TACIT "ACCOMMODATION"

Even though the Plaintiff has <u>never</u> been able to hold throughout his work life (so far) a full-time job longer than one school year (e.g., August through May of the following year, with a break for the winter holiday season, etc.), the "work situation" for the Plaintiff is gradually improving as he learns to adapt to his limitations. With compassionate "accommodation" and with an ever-improving understanding of his learning disability, the Plaintiff is becoming more and more able to function in society and work effectively. Several "class observations" from various colleges are attached (as EXHIBITS) to factually demonstrate the ability of the Plaintiff to teach effectively when he is allowed to use his specially-developed "system."

We should note well that after senior faculty from various colleges observed the Plaintiff teach, they wrote employee reviews complimenting his teaching abilities. In other words, given the freedom to work within the limits of his disability, the Plaintiff was able to function reasonably well as an instructor. Success apparently came from both hard work and, perhaps, "accommodation by default," given that the Plaintiff achieved the most success when "left to his own devices." Unfortunately, not too many jobs these days allow employees such a "free hand" in their own determination.

When the College made excessive demands of the Plaintiff in 2006 and, later that same year, when the College refused to rehire him, they created a major psychological setback for him. He suffered greatly and continues to do so because of the uncompromising attitude of the College. For the average person, losing his (or her) job is extremely stressful. When one has both ADHD and PTSD and one loses a job that one has been able to manage successfully for several years (even if it was part-time) one can become, quite understandably, *extremely* disenchanted. E-mails

and letters have been collected to serve as evidence that the Plaintiff did everything he possibly could to keep his job. These are available for "discovery."

## DISABILITY LIMITING A "MAJOR LIFE ACTIVITY"

In addition to an erratic work history (n.b., the dramatic "ups and downs" of earnings from one year to the next), the Plaintiff asserts that he has had and continues to experience a life-long "attachment" disability, chiefly related to early childhood trauma (PTSD). Indeed, Post-Traumatic Stress Disorder ("PTSD") is, perhaps, the only disorder *linked to a specific cause*, a traumatic event that threatens the life of the person or appears to do so. As such, PTSD forms a foundation for understanding psychological distress later in life where other psychological disorders leave many questions unanswered (especially regarding etiology, one presupposes). For example, many people can enjoy going to the prom early in life, going on dates later on, getting married eventually, and having children or adopting children if such suits the circumstances of life. But the Plaintiff has felt extreme distress as he attempted to cultivate such interpersonally intimate "attachments." The obvious connection to PTSD should be noted. Where early childhood trauma is concerned, it is typical for persons with PTSD to experience enormous difficulties (sometimes insurmountable) developing intimate personal attachments. This, the Plaintiff learned from his many therapists over the years.

Indeed, all of the Plaintiff's siblings have gotten married and enjoyed both the ups and downs of interpersonally intimate attachments, but the Plaintiff has never been able to experience this sort of social bond. Being very ashamed of his social isolation and other related aspects of his

disability, the Plaintiff has (on occasion) simply mentioned or mumbled that he was "involved" with someone, so as not to draw more and more attention to the more embarrassing aspects of his disability. Arguably, in American culture, such "interpersonal attachment bonds" are incredibly important to the social fabric. Indeed, without such bonds, society might not even continue to exist.

As we consider this, we should also note that people, in general, often make stray comments about their "husbands," their "wives," their "significant others," etc. The Plaintiff asserts that because of his disability he has <u>never</u> (so far in his life) experienced these intimate bonds. Should these "bonds of attachment" be considered a "major life activity?" If the answer is "affirmative," then the Plaintiff is substantially limited in this important social regard and his siblings can readily attest to the isolation he has experienced throughout his life. Should anyone ever be forced into such a life? Indeed, is it any wonder that those who have been horribly abused in early childhood are much more likely to end their own lives? Between struggling to earn livable wages and struggling to follow, perhaps, basic instincts for the perpetuation of life, a person who has suffered horrific early childhood abuse finds himself (or herself) in a very precarious psychological situation.

It should be noted, of course, that while it is certainly the case that some non-disabled persons (i.e., "monks" and "nuns") have foregone traditional social "attachment bonds," their decision to do so was, most likely, *volitional.* In the case of the Plaintiff's disability, however, the lack of "attachment bonds" was and remains non-volitional. Those who have decided to forgo close "attachments" may be especially "gifted." They are certainly not "average" in any way.

Ever mindful of society's basic needs, the Supreme Court seems to have argued in Bragdon v. Abbott, 524 U. S. 624 (1998) that the ability to reproduce is, indeed, a "major life activity." To construe "major life activity" in narrow terms that dispense with "intimate bonds of attachment" seems to fly in the face of both Congressional intent and the wise and noble opinions of the Supreme Court. In addition, there appears to be no general requirement that the "major life activity" from which a person is disabled must be the *exact activity* in which one is gainfully employed. In fact, with regards to "intimate social attachments," such "activity" would almost certainly appear to be illegal, if not also immoral. The idea proposed by both Congress and the Supreme Court appears to be that one's disability simply needs to be quite "disruptive" in one's life.

But this sort of "disruption" is extremely painful for a once-abused child to have to talk about. In fact, other persons who have been horribly abused have confessed to the Plaintiff that it is easier to "fabricate relationships than to have to admit to being a thirty-year old virgin or forty-year old virgin or fifty-year old virgin, etc., because of horrific early child abuse." Should any *child* have to go through such a thing? Should any *adult* have to explain why s/he is incapable of experiencing the sorts of close attachments that so many Americans are capable of experiencing?

In any event, the difficulty the Plaintiff experiences in creating and sustaining social "attachments" (with "significant others") is just *one* piece of the "big puzzle" of his life. Put differently, it is the confluence of interpersonal, social, and work impairments that sets the Plaintiff apart from non-disabled persons and actually defines his true status as a "disabled

person" protected under ADA, a disabled person whose psychological impairments "substantially limit major life activities."

The statutory definition of "disability" concerns having a "mental impairment that substantially limits one or more of the major life activities" or having "a record of such an impairment" (as well as "being regarded" as having such a disability). 29 U.S.C. § 705(20) (B); 42 U.S.C. § 12102(2). The Plaintiff's PTSD, in other words, satisfies *both* requirements of the statutory definition of "disability" because the Plaintiff's PTSD (as diagnosed as stemming from early child abuse) constitutes, by its own definitional existence, a "record of such an impairment."

<u>MEDICAL EXPERTS & ADHD (a.k.a. "ADD")</u>

To establish a solid foundation for a claim of discrimination based on his supervisors' actions, the Plaintiff now turns to experts in ADHD, experts who observe that "as we have begun to understand the biological basis for [ADHD, a.k.a. ADD], we are also beginning to know ADD in human terms: how it influences a life, what shape it takes, how it can get in the way, how it can actually help, and how it can best be managed" (Hallowell, Edward, and John Ratey, <u>Driven to Distraction</u>, (1994) pg. 72).

In light of this scientific and social reality, it seems prudent to ask the follow question: If medical experts (professionals with M.D.'s) are *still* discovering ways in which a relatively new disorder affects persons diagnosed with that disorder, how does a Plaintiff truly protect his rights under both federal and local law? Is it possible that the full extent of a person's disability will <u>not</u> be known, even to medical doctors, even to scientists who study a given disorder? If this is true, how, then, can a plaintiff fully explicate to the Court the full extent of his disability?

Furthermore, if even *some* of a mentally disabled person's disability is "subconscious" (i.e., beneath the patient's own awareness), how then is said Plaintiff/Patient supposed to show the full breadth of how his or her disability limits "major life activities?" S/he might not even be aware of the ways in which s/he is limited!

It seems the answers to these complex issues must lie in evidence that both directly and indirectly suggests the extent of any given disability. The ultimate question is this: Is justice best served when one considers the real-world difficulties of modern science, when one considers the very *limitations* of the science that produces valuable "evidence" and the real-world difficulties that disabled persons face? It seems the answer should be a resounding—"Yes."

But what does the ADA have to say about this conundrum? The ADA *seems* to contradict itself: in one section it states: no "covered entity shall discriminate...[by] not making reasonable accommodations to the *known* physical or mental limitations of an otherwise qualified individual with a disability." In another section, it states: "individuals with disabilities continually encounter various forms of discrimination, including...failure to make modifications to existing facilities and practices, exclusionary qualification standards and criteria...and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities." Congress, it appears, wanted to both protect employers from having to "bend over backwards till they snap" as well as protect disabled persons from the vicissitudes of intentional and unintentional discrimination.

The Plaintiff herein suggests that the apparent "contradiction" could be resolved by considering the so-called "spirit of the law" as well as the so-called "letter of the law." Perhaps this is why

people in the legal profession consider the "spirit" of the law when evaluating complex legal issues. In any event, it seems that science cannot *perfectly* isolate or define the subject which it investigates because of the complexities of that which is studied and the limitations of the scientists themselves. The most reasonable course, it would seem, for all parties to take is a course that balances the needs of the weakest members of society (arguably the "disabled") with the strongest members of society (those who are in positions of authority—the employers).

The ADA, itself, was *logically* written to protect the "weakest" members of society while also protecting the strongest members from excessive demands or the "unreasonable needs" of the weakest members. With this in mind, it seems logical to suggest that when science fails to elucidate *all* of the difficulties of any given disability, most reasonable (and logical persons) would "liberally construe" ways in which to assist the weakest members of society. In other words, employers (in this scenario) would have a moral as well as a legal obligation to do everything reasonable to discover the "known mental limitations" of persons with "mental" disabilities.

After all, Congress did not write legislation that one refers to as "Employers Who Happen to Have Disabled Employees Act," it wrote legislation that most people refer to as the "Americans with Disabilities" Act. Congressional "intent" was obviously inclining itself towards persons with *disabilities*. This "inclination," of course, was not meant to topple over and ultimately destroy employers. Nevertheless, the clear "intent" Congress had in mind seems to be to level the "playing field" as much as possible. To do so, it appears that one would have to "construe

liberally" the scientific arguments both defining and describing various disabilities. One should approach the entire issue of disability with a mind to construe things "liberally."

## THE EVIDENCE (WORK RECORD)

Considering things from a liberal perspective, we could ask ourselves: Why is it the case that the Plaintiff has not achieved the same success as so-called average Americans? Or even others who have advanced college degrees? If one concludes that "it must be because the Plaintiff has an 'attitude problem,'" then one essentially ignores the diagnosis, the scientific agreement reached by a team of specialists at a respective medical facility—Mt. Sinai Medical Center. The Plaintiff has ADHD, that is the diagnosis.

Regarding the conundrum we find ourselves facing (such that medical experts—scientists—are still not presently able to *completely* define or describe this relatively new disorder ADHD), it seems reasonable to suggest that having a closer look at the law, itself, might shed some necessary light on this issue. The ADA states: "(9) the continuing existence of unfair and unnecessary discrimination and prejudice denies people with disabilities the opportunity to compete on an equal basis and to pursue those opportunities for which our free society is justifiably famous, and costs the United States billions of dollars in unnecessary expenses resulting from dependency and nonproductivity." It seems clear that a partial intent of the ADA is to minimize "dependency and nonproductivity."

## A "DEPENDENT" AND "NONPRODUCTIVE" PLAINTIFF

As the Plaintiff is presently "dependent" upon the state for support and is hence "nonproductive," it seems that it might be extremely important to carefully review the College's actions (or *lack* of proactive actions) regarding ADA. In other words, the Plaintiff believes that the College *should* have been more helpful to the Plaintiff so as to abide by or honor, at least, the spirit of ADA, if not also its (legal) substance and/or the logic upon which it stands. One might think of it this way: the ADA *seems* to suggest the need for one "hand" of society to assist another. If this is true, then the College appears to have both a moral and a legal responsibility to be *proactive* in assisting those with *mental* disabilities.

However, as the facts will show: the College has clearly not been proactive in this regard. If fact, evidence will show that the plaintiff's supervisors showed no interest whatsoever in the Plaintiff's learning disability; they were inimical from the start to the very idea of "accommodation." The ability to work (with "reasonable accommodation") is, of course, a benefit that employers are supposed to grant qualified employees under ADA and, perhaps, other laws.

The Plaintiff's supervisors also appear to have acted with "ill will" and/or "discriminatory animus" towards the Plaintiff when he (later in the year) suggested that a "one-size-fits-all" pedagogy needed greater scrutiny. The Plaintiff's supervisors abruptly ended said meeting and immediately thereafter recommended that the Plaintiff "not be assigned further courses at C. W. Post."

<u>THE DIAGNOSIS OF "ADHA"</u>

The Plaintiff also suffers from PTSD as well as ADHD, which (in his case) seems to significantly "disqualify" him from a "class of jobs or a broad range of jobs." Point in fact, after his teaching assignment was terminated, the Plaintiff attempted to find gainful employment. His life experiences taught him to start part-time and try to build from there. He went for an interview with Metro One Telecommunications, Inc. ("Metro One") of 100 Engineers Rd in Hauppauge, NY (11788) and was accepted into the training program; he was hired on 5 February 2007. The training sessions went well, although there were the usual ADHD symptoms and the Plaintiff had to struggle hard to keep up with the other trainees.

The Plaintiff began working as a 411 operator (i.e., supplying important information to telephone queries) and enjoyed the work, though it was enormously challenging, given his limitations. After less than three week's work, the Plaintiff had to resign because of his inability to focus his attention. The Plaintiff resigned because he began to feel enormous stress and this stress apparently precipitated "flashbacks" from the past. The Plaintiff reluctantly resigned and was immediately informed by his supervisor that he could "return anytime" because his manner on the phone was "very pleasant" and he "sincerely tried to help people, even those who were rude and obnoxious." Of course, supervisors also informed the Plaintiff (as they did *other* trainees) of the mistakes he made, the times his attention wandered and he inadvertently hung up on clients before giving them the information they requested. But, in general, the Plaintiff's supervisors genuinely appreciated his efforts and reiterated that he "could return anytime" to continue working for Metro One. Unfortunately, the Plaintiff's attempts to work at Metro One only underlined the fact that he has ADHD, a disorder that has always been with the Plaintiff and has always exerted a negative influence on the Plaintiff's work record.

-------------------ADHD DIAGNOSTIC CRITERIA-----------

Noted experts on ADHD have proposed (in <u>Driven to Distraction</u> (1994), pg. 73-76) the

following criteria for diagnosing individuals with ADHD:

SUGGESTED DIAGNOSTIC CRITERIA
FOR ATTENTION DEFICIT DISORDER
IN ADULTS

Note: Consider a criterion met only if the behavior is considerably more frequent than that of
most people of the same mental age.

A.  A chronic disturbance in which at least fifteen of the following are present:

    1.  A sense of underachievement, of not meeting one's goals (regardless of how
much one has actually accomplished).
We put this symptom first because it is the most common reason an adult seeks
help....

    2.  Difficulty getting organized.
A major problem for most adults with ADD. Without the structure of school,
without parents around to get things organized for him or her, the adult may
stagger under the organizational demands of everyday life. The supposed "little
things" may mount up to create huge obstacles....

    3.  Chronic procrastination or trouble getting started.
Adults with ADD associate so much anxiety with beginning a task, due to their
fears that they might not do it right, that they put it off, and off, which, of course,
only adds to the anxiety around the task.

    4.  Many projects going simultaneously; trouble with follow-through....

    5.  Tendency to say what comes to mind without necessarily considering the timing
or appropriateness of the remark.
Like the child with ADD in the classroom, the adult with ADD gets carried away
with enthusiasm. An idea comes and it must be spoken—tact or quile yielding to
childlike exuberance.

    6.  A frequent search for high stimulation...

    7.  An intolerance of boredom.
A corollary to number 6. Actually, the person with ADD seldom feels bored. This
is because the millisecond he senses boredom, he wings into action and finds
something new; he changes the channel.

    8.  Easy distractibility, trouble focusing attention, tendency to tune out or drift away
in the middle of a page or a conversation, often coupled with an ability to
hyperfocus at times.

The hallmark symptom of ADD. The "tuning out" is quite involuntary. It happens when the person isn't looking, so to speak, and the next thing you know, he or she isn't there. The often extraordinary ability to hyperfocus is also usually present, emphasizing the fact that this is a syndrome not of attention deficit but of attention inconsistency.

9. Often creative, intuitive, highly intelligent….
10. Trouble in going through established channels, following "proper" procedure. Contrary to what one might think, this is not due to some unresolved problem with authority figures. Rather, it is a manifestation of boredom and frustration: boredom with routine ways of doing things and excitement around novel approaches, and frustration with being unable to do things the way they're "supposed" to be done.
11. Impatient; low tolerance for frustration….
12. Impulsive, either verbally or in action….
13. Tendency to worry needlessly, endlessly; tendency to scan the horizon looking for something to worry about, alternating with inattention to or disregard of actual dangers….
14. Sense of insecurity.
    Many adults with ADD feel chronically insecure, no matter how stable their life situation may be. They often feel their world could collapse around them.
15. Mood swings, mood lability, especially when disengaged from a person or a project. The person with ADD can suddenly go into a bad mood then a good mood all in the space of a few hours and for no apparent reasons. These mood swings are not as pronounced as those associated with manic-depressive illness or depression….
16. Restlessness….
17. Tendency toward addictive behavior….
18. Chronic problems with self esteem…
19. Inaccurate self-observation.
    People with ADD are poor self-observers. They do not accurately gauge the impact they have on other people….
20. Family history of ADD….

B. Childhood history of ADD. (It may not have been formally diagnosed, but in reviewing the history, the signs and symptoms must have been there.)
C. Situation not explained by other medical or psychiatric conditions.

--------END OF DIAGNOSTIC CRITERIA----

It seems clear that ADHD (especially if medication does not ameliorate the condition) substantially limits one's ability to work. That disabled persons *can* work is a tribute to their perseverance and their fortitude; this ability to work should be rewarded, not punished. When "reasonable accommodation" is possible, as Metro One accommodated the Plaintiff by providing

special headphones to minimize distraction, this should be done. However, even with "reasonable accommodation," the Plaintiff was unable to continue at Metro One. C. W. Post, however, is another story. Supervisors for the College refused to discuss possible "reasonable accommodations," even though the Plaintiff had received favorable reviews from senior faculty who visited his class. Personnel records from the College have been requested but they have not yet been provided to the Plaintiff.

## LABELING PLAINTIFF

The Plaintiff asserts that the College violated ADA when it did not rehire the Plaintiff and also when supervisors labeled the Plaintiff "unwilling to work with his supervisors," particularly when there is substantial physical evidence indicating that the Plaintiff was, indeed, seeking ways in which to address his own concerns and the concerns of the College vis-à-vis effective pedagogical practice in the classroom (given the Plaintiff's learning disability). This evidence comes in the form of e-mails and letters as well as altered syllabi and a revised Independent Education Program ("IEP") for Paige Pettyjohn, a clearly troubled student, who seems to have inadvertently instigated the conflict between the Plaintiff and his immediate supervisors.


It should be duly noted that the Plaintiff was, more or less, left to his own devices (as was typical of the treatment afforded other adjunct faculty) up until the time when he had to ask the above-mentioned troubled student to leave his classroom and not return.  After this "incident," the Plaintiff's supervisors turned their "critical eye" on the Plaintiff's pedagogical practices.

## BACKGROUND RE: SUPERVISION OF ADJUNCTS

Based on his conversations with other adjuncts and his own personal experience, the Plaintiff concludes that the College exhibited *mostly* a laissez faire attitude regarding the work that its

adjuncts were doing. There was, in other words, little supervision, with the exception of a very

occasional "class observation" of adjunct teaching. This "laissez faire" supervision occurred

despite a recently developed web-site presentation (2007-2008) that states specifically that "all

instructors are [to be] examined by a full-time faculty member during the academic year; this

faculty member is available as a resource and as a mentor"

(http://www.liu.edu/cwis/cwp/faculty/writing.pdf).


It is important to note that this web-site version of the "revised" Faculty Handbook also states:

"Observations and mentoring are intended primarily to give support to teachers through an

ongoing dialogue about aspects of teaching." The overt assumption here is that there *should* be

open dialogue between instructors and their supervisors (and "mentors"). Throughout the

Plaintiff's employment, however, there were *few* class observations, very *little* "mentoring," and

extremely *scarce* dialogue between the Plaintiff and his supervisors—that is, up until the

"incident" with the troubled student. Dialogue between the Plaintiff and his immediate

supervisors, it should be noted, dramatically *increased* after this incident. Put differently, it was

only *after* the incident with the troubled student that the Plaintiff's supervisors appeared to

dispense with their laissez faire approach.

### THE 'INCIDENT" OF THE TROUBLED STUDENT

The Plaintiff saw terror in the eyes of his other students as a troubled student cursed, ranted,

raved, and initially refused to leave the class early in the spring semester of 2006.  The Plaintiff,

keeping in mind the horrors of several well-known incidents at various schools across the

country, decided there and then that Paige Pettyjohn ("the troubled student") would not be

allowed to return to his class, for the safety of the other students as well as the instructor's safety.

Having had experience with emotionally disturbed students early in his budding career and having compassion for all people (regardless of their mental or emotional disabilities), the Plaintiff offered to do an independent study with said student (at no extra charge to the College or the student). The Plaintiff's generosity (of time and efforts) was never truly acknowledged by either the student or the College.

The troubled student was, indeed, "too much trouble" for one person to deal with (especially a learning disabled instructor) over the course of the semester and the Plaintiff's immediate supervisor (Ms. Kremer) had to take over the independent study. The extra work caused by this troubled student apparently created animus towards the Plaintiff as Ms. Kremer began to focus her scrutiny on the Plaintiff's teaching methods as well as his syllabus and everything else related to his teaching (e.g., the Independent Education Program, the "independent study," itself). Indeed, Ms. Kremer's "revised" Faculty Handbook (on-line and dated "*2007-2008*") states that "it is a very serious matter, with complex consequences, to eject any student from a class; please do so only if a situation has become unsafe" (page 11). This statement comes after-the-fact, of course. The "incident" with the troubled student occurred in the spring semester of *2006*. In any event, no one seems to have defined what "please [eject a student] only if a situation has become unsafe" means. While legal specialists take pride in narrowing down meaning, *some* academics seem to believe that a brief collection of words can define themselves.

In any event, several e-mails sent by the Plaintiff to Ms. Kremer in 2006 state quite plainly that he, the Plaintiff, thought (a) that the troubled student might cause herself harm one day and (b) that the troubled student was, indeed, acting irrationally at times. Ms. Kremer did not seem to

appreciate the Plaintiff's concerns, even though *she* apparently amended the "original" Faculty Handbook to include a brief comment regarding student behavior and "a situation" that "has become unsafe." Perhaps we need to consider how one is to accurately *define* an "unsafe situation?" Is it one in which a student curses, rants, and raves, and refuses (initially) to leave a class? Is it one in which *other* students apparently become increasingly uncomfortable? Is it one in which a student goes "berserk" and throws a chair, possibly injuring other students? Does an instructor act *before* some sort of violence occurs or only *after* it occurs?

### WHY COLLEGE TEACHING NORMALLY "ACCOMMODATES" THE PLAINTIFF'S DISABILITY

Where other employees might work continuously (e.g., from 9 to 5 with brief scheduled breaks), adjunct professors with a full work load spend generally three or four hours a day in class only twice a week, which amounts to approximately eight hours or so of actual classroom activity each week. Full-time teaching follows a similar trajectory, which leads some to conclude that "teachers have it made in the shade." Of course, *much of the work of teaching at the college level is done outside of the class* (e.g., preparing lesson plans, researching, evaluating students' work, meeting with students one-to-one, grading papers and/or exams, etc.). This sort of "independent work" is, in a sense, best "suited" to the Plaintiff's particular learning disability. With decades of practice (in school), the Plaintiff has developed a special "system" for teaching in college.

Even so, the Plaintiff had to struggle enormously hard against his disability as he sought to earn a livable wage. He purchased expensive transparency materials (with his own funds) to prepare interesting materials of a visual nature for his class, materials that would enable *him* to stay focused as he progressed through his lesson plans. He purchased videos, again with his own

funds, to supplement his lessons, to maintain his *students'* interest and *their* attention with visual aids. He devised very creative lessons, such as recording his students reading poems into a digital recording device (his own equipment) and supplementing their readings with drum beats he added at home to emphasize the meter and rhythm of poetry and to demonstrate that the music his students listened to was really just another version of poetry. His students thoroughly enjoyed these activities. Having ADHD, the Plaintiff new that the best way to maintain focus was to maintain both *his students' interest* and his *own* interest in any given activity. He knew that the old adage "an idle mind is the Devil's workshop" fit the ADHD mindset. In summation, the Plaintiff worked throughout the summer months to prepare for the following fall and spring semesters of teaching. He purchased new books (with his own money), read them, and decided whether or not to use them during the following fall and spring semesters. He was very serious about his teaching. He loved to teach, even though it was enormously challenging for him. He truly believed that with God's help, he could work full-time one day.

## ADHD & PTSD SYMPTOMOLOGY

Because both ADHD and PTSD symptomology are not common knowledge, a few brief and basic facts should be addressed within this formal complaint before proceeding further. Here are a few basic facts (excerpted from <u>Delivered from Distraction</u> (2005)) about the disorder known as "ADHD" or "ADD":

- According to the experts, ADD or ADHD "is a name for a collection of symptoms, some positive, some negative. For many people, ADD is not a disorder but a trait, a way of being in the world. When it impairs their lives, then it becomes a disorder" (page 4, <u>Delivered from Distraction</u>).

- The diagnosis of ADD is based not upon the presence of [specific symptoms]—which most people have now and then—but upon the intensity and duration of the symptoms (pg. 7).

- Brain scans of various kinds have shown differences between the ADD and the non-ADD brain (p. 8).

- The world of ADD baffles the uninformed with its complications and contradictions (pg. xxxii).

Comparatively speaking, if an individual with epilepsy is protected by ADA (as epilepsy is a neurological disorder in which persons experience periodic seizures, as opposed to a "continuous" disability such as mental retardation or blindness, which does not essentially vary over time), then the Plaintiff should also be protected by ADA. It should also be duly noted that it has never been the case that the Plaintiff was simply able to "medicate away" his disability, as some persons with milder versions of various disabilities (e.g., epilepsy) have been able to do, thus eliminating *true* disability status. This is common sense.

The Plaintiff herein asserts that at an early age he was medicated and he still experienced serious difficulties in school. These records are presently being requested and shall be photocopied and forwarded to the Court for its inspection thereof as soon as they arrive. It is important, however, to note that recent medication, of course, had to be stopped because the "cure" was worse than the "disease," sort to speak. These difficulties with medicine confirm that the Plaintiff's disability could not be simply "medicated away" as in milder forms of epilepsy or other such "non-continuous" disorders (or disorders of "inconsistent effect"). Psychological reports have been requested and they, hopefully, should arrive in time to be attached to this amended complaint or forwarded for what the Pro Se Writ Clerk appeared to call "Discovery." Of course, the Plaintiff herein asserts that he has agreed to struggle with medication (as suggested by some therapists) to see if his life-long disability can be better regulated so that he might be able to live a more normal (non-disabled) life. So far, this has not been possible.

## NOTIFICATION OF DISABILITY

Striking a different note, the Plaintiff notified Ms. Kremer, his immediate supervisor, in a face-to-face communication (a short time before 27 February 2006), that he had a learning disability, but she does not appear to recall this notification. Nevertheless, the Plaintiff "spoke" of his disability in writing in an e-mail (early in the spring of 2006). He also requested, by both his actions and his particular written queries throughout the spring semester of 2006, an "accommodation" for his disability. The "queries" just mentioned include: (a) inviting his immediate supervisor (the one who recommended "do not rehire") to visit his class to see how his "methods" actually complied with the guidelines of the department as expressed in the "original" Faculty Handbook, (b) by formally asking the College "how it handles employees with disabilities" in a letter to the V.P. of Affirmative Action (later on), and then (c) by engaging in dialogue with his immediate supervisors from the time of his having to deal with a troubled student early in the spring of 2006 up until and including the time Plaintiff received a final determination by Mr. Howard White (late in the year of 2006) that his employment had been terminated (please refer to the "2 November 2006" letter from Mr. White to the Plaintiff).


The ADA definition of "discrimination" includes not making "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability…unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112 (b)(5)(A). When Ms. Kremer demanded confusing changes (specific "due dates" when there were really monthly "due dates" ending at the last day of class for any given month) to the Plaintiff's syllabus in medias re after being duly informed in person and by e-mail of the

Plaintiff's learning disability, she was (in effect) refusing to make "reasonable accommodations" to both the Plaintiff's disability and his students' disabilities. It is important to note that some of the Plaintiff's disabled students have told him that they sometimes neglect to inform instructors of their disabilities because they fear it may hurt them in the long run. With this in mind, the Plaintiff taught his classes as though there were disabled students in it regardless of whether they identified themselves as such.

The Plaintiff believes that his disability entitles him to relief against an employer that, in this particular case, *openly discriminates* against those with disabilities by asserting that there is a "one-size-fits-all" pedagogical "process" that all instructors must follow regardless of individual circumstances or disability. Most noteworthy is the fact that the College has *never* indicated to the Plaintiff that there *are* circumstances under which the pedagogical requirements of teaching ENG 1 and ENG 2 might be altered in some fashion. The College has *never* produced any evidence whatsoever that it actually "accommodates" non-physical disabilities.

The Plaintiff asserts that the College communicated to him in an unambiguous way—throughout the entirety of his interactions with the College—that it does not and would not alter its teaching requirements for ENG 1 and ENG 2 for any reason whatsoever. Put differently, "all instructors" were to be required "to teach Eng 1 and Eng 2 in the same manner, regardless of individual circumstances or disability." This finalization of the College's position was communicated at the 11 AM meeting between the Plaintiff, Ms. Kremer, and Mr. McNabb on 24 May 2006. Since then, the College has never apparently wavered from this position.

Moreover, the College seems inimical to defining its true "objectives" in terms of "the results or outcome of a job function." It has continually referred back to its "Faculty Handbook" and the therein printed "Description of Courses." Granted, the College appears to have no apparent *legal* obligation to produce a document stating the "essential functions of the job," but this does not mean, necessarily, that the College has an incontestable right to *define* any given job in such a way as to effectively eliminate those who suffer from ADHD (or other non-mobility-related disabilities). Incredibly, the very fact that the College indicates that "objectives" are crucial to the stated purpose of its teaching assignments indicates, ipse dixit, that "results" are relevant to objective discussions regarding the proper execution of ENG 1 and ENG 2 teaching assignments.

The College later communicated to EEOC (in a letter dated 19 October 2007) that it "promises" its students a "manner or process" by which "objectives are met." That this "manner or process" might discriminate against those with disabilities does not seem to bother Counsel for the College. In fact, no evidence or factual assurance whatsoever appears to have been offered by Counsel or the College even suggesting that any "manner or process by which objectives are met" has to be restricted in the way the College envisions its version of "process pedagogy."

The ADA appears to prohibit "selection criteria" that screen out or tend to screen out a class of individuals with disabilities unless "the standard, test or other selection criteria" is shown to be "job-related" for the position in question and is "consistent with business necessity." 42 U.S.C. § 12112 (6). Is the College's one-size-fits-all pedagogy not a "selection criteria" that effectively screens out all instructors with ADHD (that can't be eliminated with medication)? Is the College's requirement that all teachers teach the same way not a "standard" that unlawfully

discriminates, especially when there is no proffered reason or reasons that basic college composition *must* be taught using the College's special brand of "process pedagogy" to accomplish goals that cannot be accomplished in any other fashion, way, or manner? Even if the College argues that it is offering "something more" than basic composition to its students, isn't there some sort of "result" or "objective" they hope to achieve? Does the College mean to argue that it is offering a special "process" that defies analysis?

Besides, if the College is *truly* more interested in "process" than "product," why does it even grade its students? Shouldn't it suffice that they, the students, proceed through the all-important "process?" Since, the College *does*, indeed, express the critical importance of grades (by calculating G.P.A.'s, by assigning status based on grades, by granting awards based on grades, etc.), and since the College apparently *does* place a high value or regard on "product" (or "objectives being met"), it is therefore disingenuous for the College to thereafter suggest that "process" substantially or irrevocably overpowers "product" or "objectives."

The Plaintiff asserts that the College (its representative supervisors) *never* communicated to him that such a "promise" to elevate process to its apparent "godly status" was either mandatory or inviolable until <u>after</u> the Plaintiff's complaint was registered with EEOC and the Plaintiff read about what appears to be an "unalterable promise" in the EEOC file provided him after he specifically requested it from EEOC.

The argument that Counsel makes that college courses (or, perhaps, *some* college courses, if such be the case) should be solely "process-oriented" is a also a bit disingenuous for the following

reason: The college requires its faculty to award grades that are by their very nature "product based," which is to say that the College agrees with the Plaintiff that grades should be awarded to individuals for individual achievement. In other words, the College appears to be categorically against giving the entire class the same grade, even though all of the students went through the same "process" together. This objection to all students receiving the same grade was expressed to the Plaintiff during his meeting with Ms. Kremer and Mr. McNabb. Indeed, during his scholarly discussion with his supervisors that fateful day, both supervisors quickly agreed that "students should be given individual grades for individual achievement." Towards the end of the meeting, it appeared to the Plaintiff that his supervisors did not truly wish to discuss pedagogical concerns; they wished to implement their "one-size-fits-all" strategy even though it might adversely impact disabled persons (e.g., students as well as instructors)!

Is the Plaintiff missing something here? If the "end result" for instructors is to produce individual grades for individual students (and, *nota bene*, we instructors do not receive our final paycheck until we actually do submit such grades), why is the "process," itself, not to be graded? By telling its instructors not to grade first- and second-drafts, the College is, effectively, downplaying the significance of its own "process." This is especially so in the minds of students, who often are interested more in grades than "process." All of this was brought to the attention of the Plaintiff's supervisors during that fateful May 24th meeting.

Because ADHD is a *mental* disorder in which disabled persons experience "attention inconsistency." A homespun version of "process" pedagogy that doesn't take into consideration

such "attention inconsistency" is liable to be highly discriminatory in its impact on both students and instructors.

It is important to note that administrators conclude (in the "original" Faculty Handbook) that "by assigning grades, instructors send the message to students that there is a 'correct' and 'incorrect' way of composing drafts." First, we might conclude that there are many "correct" ways to compose intelligent drafts, but this does not necessary mean that there is no discernible pattern that differentiates "better" methods from "fruitless" methods.

The more significant pedagogical issue, however, regarding ADHD concerns *what* one is supposed to teach. If we concede that the "process" of writing is very important (in terms of meeting specific "objectives") and we allow a literal interpretation that there is no "correct" or "incorrect" or even "better" way of working through this "process," *what—exactly—is one to teach?* Moreover, how is *an instructor with ADHD* supposed to understand or even do a job when the "process" one is supposed to teach is so confused, ambiguous, vague or otherwise unintelligible?

The subtle point the Plaintiff wishes to make is this: it is already difficult for persons with ADHD to focus. People with ADHD experience inconsistent attention (as well as other mental difficulties). When the College proposed an extremely vague teaching mandate (in unintelligible language), the Plaintiff become confused (as would anyone truly desiring to do a good job). Ms. Kremer and Mr. McNabb became visibly incensed at the end of the May 24th meeting ostensibly because their pedagogy was not being accepted "as is," i.e., without question or concern.

In essence, the Plaintiff asked a very important pedagogical question that fateful day: How does one truly teach a "process" that defies any sort of evaluation? And, why would students even need a teacher to "progress" through such an ethereal and uncharted "process?" These fundamental issues of practical critical pedagogy where raised by the Plaintiff in his meeting with his supervisors during the summer of 2006 because the Plaintiff discovered that his disability was dramatically attenuated when he was able to maintain his students' interest and attention with graded exercises and activities that were much more structured than an unintelligible or vague "process."

PEDAGOGICAL ISSUES THAT
THE PLAINTIFF'S SUPERVISORS
WOULD *NOT* CONSIDER

To clarify some of the important issues regarding the Plaintiff's learning disability, let us consider a few important observations: when the Plaintiff's students were not busy, their minds tended to wander, they tended to murmur amongst themselves, and the Plaintiff was not able to function to the best of his limits. By having his students give presentations (which most loved to do), by having his students periodically take graded exercises (to insure they put their best foot forward, to show that they actually learned something, to assess their progress, to allow their instructor time to compose himself, and to minimize the ways in which his students might inadvertently distract the instructor), by having his students discuss materials as a class (one speaker at a time, each raising a hand before speaking), and by having his students write in-class essays and other graded assignments—the Plaintiff was able to effectively accomplish the stated objectives in the "original" Faculty Handbook.

During the meeting with Ms. Kremer and Mr. McNabb, however, the Plaintiff had to *raise* concerns regarding how the department's version of "process" pedagogy could be made to work given Attention Deficit Hyperactivity Disorder (for *students* with the disorder as well as for *instructors* with the disorder). Things went rapidly downhill when the issue of disability was raised ostensibly because the Plaintiff's supervisors had not budgeted enough time to address critical pedagogical concerns and critical legal issues regarding learning how the College handles or should handle learning disabilities! The May 24th meeting was abruptly called to an end when the Plaintiff suggested that all three educators put their minds together to see how they could modify the department's "one-size-fits-all" pedagogy to fit learning disabilities, in general.

### THE "PARTICULARS" LEADING TO THE MAY 24th MEETING

In the spring of 2006, the Plaintiff's immediate supervisor Ms. Kremer apparently sought to clarify issues with the Plaintiff regarding <u>when</u> student writing assignments would be handed in, <u>when</u> they would receive instructor comments, and <u>when</u> they would need to be revised. In a letter dated 23 February 2006 Ms. Kremer states: "I need to receive from you a full syllabus, including due dates for reading and writing assignments (initial assignment due date; revision due date), and a clear statement of your grading policy." Before the semester even began, the Plaintiff had provided the College with copies of his syllabus, which included a very extensive description of his grading policy (n.b. this syllabus is attached as evidence) and what would be covered throughout the course, month by month. As was his habit, the Plaintiff regularly responded to the College's needs (e.g., copies of syllabi), as sometimes requested.

In addition, the Plaintiff responded by e-mail (dated: 23 February 2006) to Ms. Kremer that he would "adjust the timeline" on his syllabus. Within that very same e-mail, the Plaintiff explained

how he worked diligently to determine "student learning curves" so he could "adjust reading assignments to reflect [students'] evolving capacities to 'digest' particular texts."

In other words, the Plaintiff was doing everything in his power to continually modify his teaching based on current student learning curves. The Plaintiff explained to Ms. Kremer in person during one of their impromptu chats (sometimes in the hallways between classes) that he developed his somewhat unique "system of constant correction" to assist learning disabled students as well as non-disabled students. It was (and remains) part of his continuing research on how to better help learning disabled persons.

In fact, Ms. Kremer, in her own "revised" Faculty Handbook of 2007-2008 states that "every section [of a course] is different, every student is different, and we are different each time we teach; the best way to adapt your teaching to any given class is the tried and true: Get to know your class, and adapt accordingly" (see page 4 of the on-line "revised" Faculty Handbook). There appears to be a blatant contradiction here if one interprets "get to know your class" as encouragement to assess students' collective and/or individual strengths and weaknesses.

Ms. Kremer appears to encourage "adaptation" in her "revised" Faculty Handbook (2007-2008) but earlier, when she wrote about the Plaintiff, she labeled him "not a good fit for the FYC [First Year Composition] program." This statement was made in Ms. Kremer's letter (dated: 31 May 2006) to Edmund Miller, Chair of the English Department, in which she "strongly recommend[s] that [the Plaintiff] not be assigned further courses at C. W. Post." Yet, throughout the spring semester of 2006, the Plaintiff sought to "get to know his class, and adapt accordingly." There

are copious e-mails to suggest that this "assess, then adapt" approach, was, indeed, what was going on throughout the spring semester of 2006.

## LEARNING DISBAILITIES AND "ADAPTATION"

The Plaintiff, having always suffered from a learning disability, has developed and continues to develop an ever-flexible system for administering the form of "process pedagogy" that allows for revision of work at the student's own pace vis-à-vis "student journals," which generally receive periodic comments and indications of whether the work was "average," "below-average," or "above average" from the instructor. Ms. Kremer did not immediately object to this sort of "pseudo-grading," which was more of a guide to students (to enable them to get a handle on how they were doing and to encourage them to put "their best foot forward") than a rigid grade, even though the syllabus admittedly suggests otherwise.


To clarify matters, the Plaintiff's original syllabus for ENG 2 states "[students] are required to take legible notes of specific lecture material or other items produced during class time. These in-class and out-of-class assignments will be graded." The Plaintiff informed Ms. Kremer in a professional tête-à-tête (in February of 2006) that he discovered that his students (in the past) would not put much effort into first and second drafts if no grade were attached. Some of his students had frankly stated that it was a simple matter of "why bother?"—meaning: "Why waste the effort if it's not graded? It's easier just to throw something together and put real effort in when it counts." Of course, this sort of "sloppy" writing is not helpful to students, and Ms. Kremer agreed.

Turning to the "original" Faculty Handbook, therein one reads that "students are <u>required</u> to turn in drafts of all major essays" and therein one reads a caution to instructors: "these <u>drafts are not to be graded.</u>" Even so, Ms. Kremer did not express reservations early in the spring semester regarding the Plaintiff's system of encouraging more student effort by marking journals with "pseudo-grades." The main thing, according to Ms. Kremer, was for *essays* to be rewritten, the instructor to read them and to offer both "comments and advice" for improving the essays. This sort of "flexible" or "laissez-faire" approach by supervisors regarding specific requirements of the "original" Faculty Handbook was typical. In fact, from the Plaintiff's personal experience on the job, supervisors rarely commented on the work that adjuncts were doing.

THE PROBLEM WITH "DUE DATES"

Another "bone of contention" between the Plaintiff and his immediate supervisors in the middle of the spring semester was assignment "due dates." The Plaintiff explained in an e-mail dated 27 February 2006 and written to Ms. Kremer that "due dates" for writing assignments were "month specific," which is to say that assignments had to be completed by the end of the month. Logically speaking, the last day of class prior to the end of the month constituted the "due date." Ms. Kremer, however, insisted on there being specific written-in dates on the Plaintiff's syllabus as per *her* syllabus. The Plaintiff attempted to comply as best he could but was unable to supply realistic "due dates" because his students were experiencing difficulties comprehending the complex research in the mandatory text, which was edited by both Ms. Kremer and Mr. McNabb.

This "mandatory text" featured articles written by other faculty at the College so there was, perhaps, added incentive to incorporate the text into the curriculum (it is accepted that a College

enhances its "prestige" when faculty publish), even if it might be beyond the ability of first-year college students to grasp its significance.

The Plaintiff, in other words, was not given sufficient time, given his learning disability and the "quickly-added-to-the-syllabus" mandatory text, to comply with his supervisors' demands. While it is true that an instructor could just write almost arbitrary dates on the syllabus and not really expect students to adhere to this sort of hastily thrown together "schedule," the Plaintiff thought his immediate supervisor probably wanted a *workable* solution, and these expectations drove his confusion and frustration in endless loops. What did his supervisors really want? If the syllabus could be "flexible" as Ms. Kremer once suggested, and if her professional attitude is consistent in that good instructors should "get to know their students, then adapt," then why was there such a compelling need to set day-specific "due dates?" Why didn't the Plaintiff's supervisor—Ms. Kremer—consider "by the end of the month" to be an established "due date?" The Plaintiff was truly at a loss how to help his students and simultaneously figure out what Ms. Kremer truly wanted or needed.

THE "GET TO KNOW YOUR STUDENTS, THEN ADAPT" MAXIM

The Plaintiff raised concerns (in the e-mail dated 27 February 2006 to Ms. Kremer) that his students were having difficulty with the mandatory text. The Plaintiff attempted to explain to Ms. Kremer how he was responding to his students' difficulties and their frustrations with the complexity of the text: he was, in effect, slowing things down. The Plaintiff fully recognized, because of his learning disability, that one does not learn by being force-fed information, especially when one is learning disabled. Flexibility is essential for learning-disabled students and, indeed, it is very helpful for non-disabled students. This is not to argue that a syllabus

should have lax attendance rules or weak requirements for specific writing assignments; it is simply to argue that a compassionate instructor will adjust the rate at which he covers materials to best serve his students. Ms. Kremer apparently agrees, given her "get to know your students, then adapt" suggestion in the "revised" Faculty Handbook of 2007-2008.

Point of fact, he, the Plaintiff, was engaged in continuous research throughout his teaching career. He was, as his graduate mentor in grad school recommended he should be—a "teacher as researcher." This is important because one of the Plaintiff's supervisors referred to the Plaintiff's cutting edge pedagogy in an e-mail. Richard McNabb, Associate Dean of Liberal Arts and Sciences, wrote in an email (attached) dated 1 January 2006: "We [administrators] are moving ENG 2 toward a WAC (Writing Across the Curriculum) model. If memory serves me, this is an approach you already take in your writing courses. The required WAC book, *Collide*, has been ordered for you, but please be sure to include it on your syllabus."

Please note (a) that the complex research text just mentioned was "ordered" for the Plaintiff in January of 2006 of the semester in which the text was supposed to be used, actually weeks before classes were to begin and, (b) that persons with learning disabilities generally require more time to process, organize, and manage materials than those without learning disabilities. The Plaintiff had no idea how difficult the mandatory text would be for his students and this contributed to the difficulties he faced in the spring semester of 2006.

## INCENSED ABOUT "ACCOMMODATING"

Both Mr. McNabb and Belinda Kremer became incensed when the Plaintiff observed in their one-time only meeting together (n.b., 24 May 2006) that the College was not being very

compassionate to both instructors and students with learning disabilities. A pedagogy that insists on small group discussions virtually ensures both instructors and students with ADHD that they will be "short-changed." Mr. McNabb, in fact, the day after this meeting, composed a heated memo to Ms. Kremer and Edmund Miller (n.b., dated 25 May 2006), stating that the Plaintiff was "resistant to basic department requirements and has limited knowledge of writing and composition theory." This statement, itself, seems to be quite libelous.

The above attitudinal shift from "if memory serves me, [Writing Across the Curriculum] is the approach [the Plaintiff] already take[s] in [his] writing courses" to "[the Plaintiff] is resistant to basic department requirements and has limited knowledge of writing and composition theory" is quite dramatic! It seems that both Ms. Kremer and Mr. McNabb did not like to be reminded that the College has a moral obligation—if not also a *legal* obligation—to assist both instructors and students with disabilities when doing so does not pose unreasonable difficulties for the College.

While Ms. Kremer initially admitted that there was "flexibility" in what the Plaintiff could do in terms of amending his syllabus in medias re, both Ms. Kremer and Mr. McNabb insisted at the May 24th meeting that the Plaintiff employ exclusively the department's particular version of "process pedagogy" in the immediate future, which was to require mostly small-group discussion during class time and which was to set rigid dates ("not the end of each month!") for students to hand in writing assignments. The Plaintiff informed his supervisors during said meeting that he had tried to teach by assembling students into small-groups early in his career but he became too distracted by simultaneous conversations; he quickly lost his focus and was unable to adequately

assist his students. In other words, his disability precluded such an activity as a regular everyday practice.

The rigid requirements for teaching mostly in a small-group discussion format, which his supervisors called "process pedagogy" was most inappropriate to the Plaintiff's needs and also to his students' needs, especially those with disabilities, who generally need much more flexibility than the College allows in their special version of "process pedagogy."

With this in mind, the Plaintiff engaged in what he believed was intellectual discourse to discover how he could satisfy the "essential functions" of his teaching job all the while providing compassionate pedagogy (for disabled as well as non-disabled students). His supervisors insisted: "Everyone is required to teach the same way. There are no exceptions!" This meeting occurred on 24 May 2006. It started at approximately 11 AM, according to the Plaintiff's records.

### CLARIFYING THE ESSENTIAL FUNCTIONS OF THE JOB

Roughly a month after this meeting, indeed after the Plaintiff returned from a trip to Italy with his mother (who was suffering from a debilitating loss of vision), the Plaintiff, through a series of letters directed to Howard White, Associate Vice President for EEO and Labor Relations, sought to clarify how he, the Plaintiff, was not actually fulfilling the "essential functions of the job" as indicated (or implied) in the (original) Faculty Handbook. Mr. White then mailed what appeared to be a hastily put together "revised" Faculty Handbook with specific alterations in bold-faced type. One must ask why these "revisions" were printed in bold-faced type. Were these bold-faced "revisions" composed after-the-fact, as the Plaintiff asserts? And, why was there no cover to the

"revised" Faculty Handbook? Doesn't this suggest that it was composed in a flurry and sent to the Plaintiff and, perhaps, to EEOC to dissuade EEOC from prosecuting the case?

## VIOLATION OF CONTRACT

Plaintiff asserts that C. W. Post of Long Island University (the "College") discriminated against him by, and among other things, terminating his employment as a Level III Adjunct English Professor, in line to become, possibly, a full-time instructor, as per indications in the Agreement Between Board of Trustees of Long Island University and the Communications Workers of America (Nov. 1, 2005 – October 31, 2008). The Plaintiff believes that the "one-size-fits-all" form of process pedagogy advocated by the College violates ADA ipso facto, especially since there does not appear to be factual indications that "accommodations" of any sort would automatically "change essential elements of the curriculum" or "compromise curricular standards."

Moreover, the Plaintiff was apparently able to effectively perform the essential functions of his job for several years before his employment was terminated. In that time, the Plaintiff received only favorable reviews. The Plaintiff asserts that he worked hard to accomplish the tacit goals of the English department; he reviewed the instructional requirements as stated in the "original" Faculty Handbook supplied to the Plaintiff long before he was terminated and he reviewed materials provided him by his immediate supervisor and engaged in necessary exchanges of e-mails with his supervisor to clarify important pedagogical issues.

## COLLEGE ACTS WITH "ILLEGITIMATE ANIMUS"

The Plaintiff asserts that the College in bad faith (i.e., with illegitimate animus or "ill-will") altered its description of the requirements of the teaching assignment after a complaint was filed. Put differently, the College, with retaliatory animus, created a "revised" Faculty Handbook—an altered handbook—to justify terminating the Plaintiff's employment based on "academic grounds" as opposed to having to alter its job requirements to comply with ADA and other laws.

Contrary to the claims of the College, the Faculty Handbook was <u>not</u> routinely distributed to all faculty members (as alleged in Counsel's letter to EEOC). The Plaintiff further asserts that, under duress, he offered (during the summer of 2006) to make any and all changes in his syllabus to keep his job but he was still terminated, "with apparent prejudice" (i.e., with*out* the option of appealing and *with* discriminatory intent).

PLAINTIFF'S ATTEMPTS TO COMPLY

Finally, the Plaintiff asserts that he attempted to show the College that he was, indeed, trying to fulfill the "essential functions of the job" (as he understood them). To this end, he provided the College with a discarded student journal to show that he was, indeed, adhering to the writing requirements of the department as indicated to him in a meeting prior to his "termination." Earlier, when he was actually teaching, the Plaintiff invited his immediate supervisor to visit the class to see first hand what was going on in the class, to see for herself whether he was complying with the course description, but the immediate supervisor declined the invitation. Instead, the Chair of the department visited one of the Plaintiff's classes (on 29 March 2006) and wrote a favorable review. According to the "revised" Faculty Handbook, a supervisor *should* have visited the class to observe the Plaintiff's teaching.

## REASONABLE "ACCOMMODATIONS?"

The Plaintiff believes that the College's stubborn and inflexible requirements for teaching Eng 1 and Eng 2 violate ADA ipso facto because the College has never provided factual proof that reasonable accommodations would "change essential elements of the curriculum" or "compromise curricular standards." As one could read in both the "original" Faculty Handbook and the "revised" Faculty Handbook, the basic *goals* of composition courses appear to be (a) "to promote clear thinking and effective prose," (b) to "learn the conventions of academic writing, and (c) to "learn how to adapt writing for various audiences and rhetorical situations" (see: "Description of Courses and Procedures" in both Faculty Handbooks).

## "RELIEF" SOUGHT BY PLAINTIFF

The Plaintiff seeks (a) past-wages and future wages to the amount of $1,480,00 (derived from an approximate national average salary of $74,000 for full-time faculty salaries [times] 20 years of expected teaching); plus (b) $2,000,000 in punitive damages for acting in "bad faith" by altering the Faculty Handbook, by refusing to even consider accommodation, by adding additional and unwarranted stress to the Plaintiff's life, and by attributing false statements to the Plaintiff, plus—the Plaintiff seeks (c) a reference letter based on the favorable class observations already in the Plaintiff's personnel file, and finally, (d) an apology from those who made the absolutely false and incredibly reprehensible claim that the Plaintiff said "no one could tell him what to do" regarding his teaching. E-mails will show that this claim is inconceivable given the Plaintiff's attempts to show how he was, in deed, complying with the College's goals as stated in the original Faculty Handbook.

## THE ULTIMATE "BALANCING ACT"

To be completely fair, it should be duly noted that no disability whatsoever, whether mental or physical or some combination thereof, "entitles" an employee to behave poorly in the work place or to act insubordinately or aggressively towards his supervisors, especially where the employer's specified concerns are intended for the welfare of the students the institution is hoping to educate.

The fact that the Plaintiff received good reviews by senior faculty and the fact that the Plaintiff never received criticism from those who directly observed his teaching or any other supervisor at the College (with the exception of Ms. Kremer and her friend, Mr. McNabb) is extremely pertinent in suggesting (if not also proving) that the Plaintiff acted at all times in good faith while there appears to be plenty of evidence that the College acted in bad faith and its communications should be digested with more than a few grains of salt.

Respectfully submitted to the Court by,

John C. Manigaulte

John C. Manigaulte
Plaintiff – CV 09-1853

Dated: June 30, 2008

# SEE COURT FILES FOR

# EXHIBIT(S)