**UNITED STATES DEPARTMENT OF EDUCATION**
OFFICE FOR CIVIL RIGHTS
32 OLD SLIP, 26TH FLOOR
NEW YORK, NEW YORK 10005

TIMOTHY C. J. BLANCHARD
DIRECTOR
NEW YORK OFFICE

August 3, 2009

Catherine Murphy, Esq.
Associate Counsel
Long Island University
700 Northern Boulevard
Brookville, New York 11548-1327

Long Island University
Received

AUG 06 2009

Office of
University Counsel

Re:   Case No. 02-09-2096
      Long Island University – C.W. Post Campus

Dear Ms. Murphy:

This letter is in response to your request for documents, which the U.S. Department of Education, New York Office for Civil Rights (OCR) received on June 29, 2009. Specifically, you requested a copy of the complaint in a case filed against Long Island University, Case No. 02-09-2096. The Freedom of Information Act (FOIA), 5 U.S.C. § 552, and its implementing regulation, at 34 C.F.R. Part 5, govern your request to OCR for information. Therefore, your request was processed under the provisions of FOIA and the applicable departmental regulations.

Your request is granted and a copy of the complaint is enclosed. As agreed upon in the email sent on June 29, 2009, names and other personally identifiable information have been excluded as non-responsive to your request.

If you have any questions regarding this matter, please feel free to contact Jocelyn Frank, Compliance Team Attorney, at (646) 428-3796 or via email at jocelyn.frank@ed.gov, or David Hensel, Compliance Team Attorney, at (646) 428-3778 or via email at david.hensel@ed.gov.

Sincerely,

Nadja Allen Gill
Compliance Team Leader

Enc.

The Department of Education's mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.

2009-745
RD

[Nonresponsive]

RECEIVED
2009 MAY 26 PM 1:22
U.S. DEPT. OF EDUCATION
OFFICE FOR CIVIL RIGHTS
NEW YORK, NEW YORK

May 19, 2009

Office for Civil Rights/New York
U.S. Department of Education
32 Old Slip, 26th Floor
New York, NY 10005

RE: "REASONABLE ACCOMMODATIONS @ C.W. POST"

Dear Civil Rights Officer/Agent:

I am writing to you regarding my concern that C. W. Post of Long Island University (LIU) seems quite adverse to making "reasonable accommodations" as required by the Americans with Disability Act of 1990 (ADA) and Section 504 of the Rehabilitation Act of 1973.

I am a [Nonresponsive] against LIU because [Nonresponsive] at the College stated to me (a [Nonresponsive] at the college) that "everyone teaches the same way, regardless of disability or individual circumstances."

You see, I have a learning disability. I have had a learning disability all of my life. Unfortunately, my disability (ADHD and PTSD) can't be eliminated with medications: as medication for one disability exacerbates symptoms of the other disability. Also, stress from dealing with administrative resistance to complying with ADA and related statutes has exacerbated my PTSD symptoms.

As a learning-disabled student, I struggled in school. It took me a long time, but I earned several college degrees (e.g., a B.S. in educations, as [Nonresponsive] and a [Nonresponsive] ). Over the course of my life, I learned from a few great teachers and therapists. Some things I just learned on my own. After I obtained each

[Nonresponsive] New York, Federal Courts

degree, I returned to [Nonresponsive] and employing the things I learned over the entire course of my life to helping [Non resp] students.

[Non resp] students, particularly those with learning disabilities, were extremely appreciative of (1) the fact that I told [Nonresponsive] about my disability and (2) that I had learned methods of [Nonresponsive] (and learning) that were enormously helpful to both learning disabled students and non-disabled students (and I was using these methods to help *all* of [Non resp] students).

[Nonresponsive] at LIU (my latest [Nonresponsive] assignment) were not, however, impressed with [Non resp] ideas as they had developed their own methods (and teaching materials) and they subsequently insisted that "all teachers" without exception employ *their* pedagogical strategies.

Problems immediately arose between me and these [Nonresponsive] because these two [Nonresponsive] insist that all teachers use "collaborative writing" and the "process model of teaching writing."

"Collaborative writing" consists of breaking the class into small groups for small-group discussion and "student self-help." In this style of teaching, the instructor is supposed to wander around from group to group and offer advice and suggestions as well as listen to and comment upon student ideas.

I have ADHD. I cannot focus when multiple conversations are going on around me, all at the same time. To me, "collaborative writing" was an extremely stressful situation as I struggled to help [Non resp] students—but was not very effective, given my disability. I tried to use this "required" method, this style of [Nonresponsive] and the required "teaching materials," but experienced, instead, extreme stress, and informed my [Nonresponsi] about my difficulties.

They simply responded that "all [Nonrespo] are required to [Nonr] the same way, regardless of disability or individual circumstances."

2

I met with [Nonresponsive] to discuss this and other concerns that I had about their "required teaching methods" as I believed their methods adversely affected persons with learning disabilities (me, as well as [No] students with learning disabilities). I even informed [Nonresponsive] students had informed me that they did not self-identify as learning disabled students because of the way teachers and students had treated them when they had self-identified in the past.

I completely understood [Nonres] students' concerns.

I spoke of these and other matters to [Nonresponsive] and they seemed to listen. But, later in [Nonresponsive] when I expressed my concerns that the "required text" [Nonresponsive] was "disability *unfriendly*" and when I demonstrated how [Nonresponsive] and certain "requirements" were unfair to learning disabled students (and underprivileged students, one might add), [Nonresponsive] became irate and abruptly [Nonresponsive].

I was later informed that I was [Nonresponsive].

Subsequent to this, a letter was sent by [Nonresponsive] implying that I was a [Nonresponsive] one who refused to [Nonresponsive] and one who had [Nonresponsive].

I was stunned by these [Nonresponsive] which is why I am very leery of making [Nonrespon] complaints about what goes on at C. W. Post.[2] Even so, it bothers me that learning disabled students (enrolled in C. W. Post's Academic Resource Program) are being charged $1,740 per semester for "special assistance."

---

[2] I did, however, recently send a [Nonresponsive] about their [Nonresponsiv] and possible [Nonresponsive] violations. I am trying to help them do the right thing so that they might better serve learning disabled students.

3

I believe that ADA, the Rehabilitation Act of 1973 – Section 504, and multiculturalism (which is basic human compassion for differences)—all require postsecondary institutions to provide "reasonable accommodations" —which means that postsecondary institutions need to modify teaching methods and materials to better serve both learning disabled students and those without such challenges if doing so does not alter legitimate educational objectives or impose a financial burden on the institution.

Colleges and universities cannot simply "hand off" the statutory responsibilities and requirements of ADA and Section 504 to "special programs" that charge learning disabled students *substantial fees* in addition to costly regular tuition charges.

I hope that I am right in believing that both individual teachers and administrators are required to play significant roles in the statutory requirements of ADA and Section 504. [Nonresponsive] simply cannot be told (as I was told by [Nonresponsive] that "everyone [Nonresponsive] the same way regardless of disability or individual circumstances."

LIU has a financially self-supporting "special program" (called the "Academic Resource Program") to assist learning disabled students. I believe this profit-oriented program (as it appears to be) may have contributed to [Nonresponsive] believing that neither they nor their subordinates have to be flexible enough to make "reasonable accommodations," as required by the federal statutes.

The "corporate attitude" of LIU (gleaned from its own web-site) seems to be that the ADA and Section 504 allow large postsecondary institutions to charge learning disabled students for valuable educational assistance. My reasoning is that public entities do not charge persons in wheelchairs for use of expensive concrete access ramps and elevators, so why are colleges and universities allowed to charge for "mental access ramps?"

Perhaps I am overly protective of learning disabled persons?

In any event, I was, indeed, [Nonresponsive] (and accused of being [Nonresponsive]) ostensibly because I asserted in several e-mails to [Nonresponsive] program [Nonresponsi] throughout the [Nonresponsive] that [Nonresponsi] utilizing a variety of "teaching methods" and materials to assist both learning-disabled and underprivileged students in [Non] classes. Non-disabled students, of course, also benefitted from [Non] efforts.

[Nonresponsive]

just those with learning disabilities and poor economic backgrounds!

In a nutshell, I believe that LIU has a financial motive or incentive to maintain the "status quo." Circumstantial evidence seems to suggest that LIU has a "corporate attitude" that seems to take on an "earnings approach" to the concept of "reasonable accommodation."

The College might argue that its "learning center" *can* help learning disabled students (at no cost), but this argument does not negate the fact that the College is raking in monies with its ARP program: $3,500 per student per academic year. If ARP accommodates 130 students (as LIU's web-site suggests it *can* accommodate), this income amounts to $455,000 per year (nearly ½ million dollars per year)! Multiplied over several years, we are talking about the potential "earnings" of millions of dollars.

But—what if these "special charges" were hardly necessary? What if modifications to [Nonresponsiv] "teaching requirements" could improve both reading and writing for learning-disabled students as well as unchallenged students? What then?

Well, millions of student dollars could be saved! [Nonresponsive] learning disabilities would be granted "reasonable accommodations" and [Nonresponsi] would be unlawfully

5

[Nonresponsive] for being concerned that [Nonrespons] was adversely impacting persons with learning disabilities.

Throughout the [Nonresponsive] that there *are* many pedagogical "adjustments" that can be implemented in regular classrooms to assist both learning-disabled persons and non-disabled human beings. What is truly noteworthy is that I expressed [Nonresponsive] that some of the "teaching requirements" mandated by [Nonresponsive] supervisors were adversely impacting persons with learning-disabilities as well as non-challenged individuals who entered college without adequate preparation.

The "system" (i.e., the way LIU operates) appears to be inherently maladaptive, probably because administrators feel that the needs of learning disabled students are adequately covered by ARP, at extra cost to the learning disabled student, one must add!

But the America With Disabilities Act of 1990 (and the latest "revision") is supposed to "level the playing field" for persons with disabilities. It is supposed to do so without creating a class of "persons with disabilities" who <u>can</u> afford extra "special assistance." What happens to learning disabled students who need ARP assistance but cannot afford it? LIU does not advertise that it makes ARP available free-of-charge to students who cannot afford such a program!

Still, I wonder:

- Does it truly matter how "special" LIU's "special assistance" is?
- Should we care *who*, exactly, determines whether "special assistance" is really a "reasonable accommodation" or something beyond "reasonable accommodations?"

> Is *any* given public entity, such as LIU, the ultimate arbiter on what constitutes "reasonable accommodations" and what constitutes "special assistance" for which disabled persons might and/or should be charged?
> Who, if anyone, should define the "fine line" between "reasonable accommodations" and "special assistance" for which a fee can be legally charged learning-disabled persons?
> Furthermore, how is ADA and Section 504 going to accomplish their noble goals if public entities, such as LIU, can charge disabled persons for "accommodations?"

As [Nonresponsive] who has lived his entire life with a learning disability, I can truly assert (from my lived experiences) that *much* can be done inside regular classrooms to assist both students with learning disabilities and those not challenged by such disabilities.

From my extensive (and difficult) experiences in school throughout my life, I can assert that LIU's mandated "process model of teaching writing" is a detriment to both students with learning disabilities and underprivileged students entering college for the first time. I think the [Nonresponsive] program offers minimal assistance to non-disabled students. Put differently, LIU's "teaching requirements" may have been borne of good intentions, but supervisors need to listen to both teachers and students if they are to discern problem areas and work together to improve the plight of those less fortunate than most.

It is important to note that *some* educators have been arguing for years that America is failing its students—those with learning disabilities and those without.

LIU, however, claims that ARP provides one-on-one "learning assistants" to better assist learning disabled students. But didn't Congress and the courts expressly indicate that an "individualistic approach" to disability is the most realistic, as a "one-size-fits-all" approach is clearly not in the public interest?